■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH JONES, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered April 14, 1978, convicting him of criminal sale of a controlled substance in the second degree, upon a jury verdict, and imposing sentence. Judgment affirmed. In the circumstances of this case, the defendant was not deprived of a fair trial by the references to 696 Washington Avenue as a "main distribution point" for heroin and the undercover officer's statement that he "went back to purchase some more narcotics." Both statements were the subject of objections followed by curative instructions, after which no further objection or motion for a mistrial was made. Thus, the court "must be deemed to have corrected the error to the defendant's satisfaction" (see *People v Williams,* 46 NY2d 1070, 1071). As to the third claim of error—testimony that a second man entered the building, gave the defendant money and requested "halves"—not only was there no objection to the testimony but on cross-examination defendant deliberately elicited a repetition of the testimony concerning the second man and used it in summation to imply that the undercover officer was confused as to who had actually sold him the heroin. Thus, there is no reason to invoke interest of justice analysis to reach this particular issue. In short—and despite the eloquence of our dissenting colleague—we do not believe the asserted errors in this case rose to the level of depriving the defendant of the fair trial to

which he was entitled, and, in the context of this case, they were at worst harmless error. We see no merit worthy of comment in defendant's other contentions. Hopkins, J. P., Titone and Lazer, JJ., concur.

Gibbons, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum: Reversal is sought on numerous grounds. Essentially, the question presented is whether the record demonstrates the existence of such prejudice as to have effectively denied the defendant a fair trial. I believe that testimony was received at this trial which tended to create, in the jurors' minds, the impression of the defendant's guilt by improper suggestions of criminality by association and references to the commission of other crimes by him not the subject matter of the instant indictment, and, for these reasons, the judgment should be reversed. In attempting to elicit introductory background evidence pertaining to the police preparations in effecting the defendant's arrest for the offense which ultimately resulted in the subject indictment, the prosecuting attorney obtained from Sergeant McGowen a description of the premises with which the appellant was repeatedly associated during the trial as follows: "696 Washington Avenue had been a location which was a *target* of the investigation * * * from its inception. That location in addition to two others were the *main distribution points for heroin* in that area." (Emphasis added.) In *People v Sifford* (76 AD2d 937), this ploy of associating the defendant with a particular locale so as to imply guilt by such association was found to be error, in the following language: "Additional prejudice resulted, we think, when the detective testified that at a time when he was aware of defendant's identity, he told the complainant that he would take him to see the perpetrator in 'a particular area where a lot of methadone addicts hang out'." In his interrogation of Police Officer Heron, the prosecutor elicited the following description of the police unit known as the O.C.C.B. unit to which he was assigned: "Q. Now, Officer Heron, where were you assigned on April 30, 1977? A. I was assigned to the O.C.C.B. Unit. Q. Could you explain what that was please? A. That's the unit of the Department responsible for the investigation of *organized* or *ongoing* crimes of an *organized* nature. They specifically investigate allegations of narcotics or prostitution, gambling and such." (Emphasis added.) Both of the foregoing responses were calculated to and did produce a prejudicial and impermissible background atmosphere that the defendant was a participant in "organized" crime, and since he was present at one of the "main distribution points", it must follow that he is guilty. In *People v Sorenson* (70 AD2d 892, 893), this court held, with respect to a similar reference to the defendant by a police witness, that his response "that the purpose of the operation was 'to lead us into high heroin and cocaine dealers, the upper echelon [t]he target of the operation was William Sorenson', improperly implied that Sorenson was 'upper echelon'." The degree of suggestion of guilt by association in the instant matter is no less prejudicial. This attempt on the part of the prosecutor to impress upon the jurors that the defendant was a constant drug law violator with a propensity to deal in narcotics elicited the following testimony on his direct case to the effect that defendant was engaged in two other criminal transactions which were not alleged in the indictment. When the prosecutor questioned the undercover police officer concerning a meeting with the defendant on the street on May 3, 1977, which was several days after the sale which was the subject matter of this indictment, the record discloses the following: "Q. What happened when you saw him at that time? A. At that time I went back to purchase some more narcotics." This tactic of introducing into the record the commission of an uncharged

crime was repeated again when the same officer, while describing the transaction involved in this case, also testified on direct examination concerning another similar crime. The record in this connection is as follows: "Q. What happened then? A. And at that time the other male black that came in the doorway with me asked the defendant for two halves and then counted out some money and gave it to him. Q. Did the defendant do anything at that time? A. Yes, he then went up the stairs to the first apartment. Q. What did you do? A. Waited in the hallway. Q. The other man who came into the building with you, what did he do? A. He waited also. Q. Did there come a time when the defendant returned. A. Before that, another male black came out of the apartment and said he will be a while. He has to make up two more bags. * * * Q. Officer, did there come a time when the defendant returned? A. Yes. Q. Approximately how long after he left you did the defendant return? A. A short time. Q. What happened when he returned? A. He came down the steps and he counted out eight glassine envelopes and gave them to me. * * * Q. What happened then? A. I put them in my pocket. Q. And then what happened? A. The defendant gave the other male that was waiting with me two glassine envelopes." Evidence of such uncharged crimes was introduced solely for the purpose of establishing a criminal propensity to commit such offenses. It was legally irrelevant and inadmissible and constituted improper evidence which profoundly suggested the defendant's guilt (see *People v Fiore*, 24 NY2d 81, 84; *People v Jones*, 62 AD2d 356, 358; *People v Pippin*, 67 AD2d 413, 417). Although certain tape recordings involving this transaction had previously been suppressed by the court for the reason that they were of such poor quality as to be incomprehensible, the prosecuting attorney, at the outset of the trial, elicited from Sergeant McGowen an elaborate description of the available electronic sound apparatus. His testimony, in part, is as follows: "Q. Now aside from transmitter, did anyone have a receiver to receive transmissions? A. Yes. The surveillance truck was equipped with a large Kel receiver, approximately the size of a small briefcase and that receives the transmissions. THE COURT: A Kel receiver is what? THE WITNESS: Kel receiver used on that date is a receiver and combination of recorder. It receives and records simultaneously and it's able to be monitored by the people in the truck who can hear what's coming over and at the same time record the information." He also testified that by this device it was possible to obtain sound signals from a hidden transmitter carried on the person of the undercover officer. It was most inappropriate to bring all of this information to the attention of the jury when it was then known to the prosecution that the tape recordings could not be used at the trial. Such information could only serve the purpose, as a contrived trapping, of improperly leading the jurors to believe that tapes were in existence which could substantiate the prosecution's witnesses, whereas, in fact, no such tapes were available as evidence in this case. This impropriety was further amplified when the court likewise proceeded to question the witness concerning the operation of this device which precipitated the following sidebar colloquy between the District Attorney and the court: "MR. LEVINE: I am now in a position, I prefer not to be in. This witness was instructed not to mention the tape recorder. It was in response to your Honor's question he felt compelled to give a complete description. THE COURT: No, You were well into that before I asked my question. MR. LEVINE: He had not mentioned the recorder, your Honor. THE COURT: Yes, he did, If you want the reporter to reread it, we can have that. He did testify with respect to the Kel and the Nagra that other officers were equipped with recording equipment before I asked him a question. The only

reason I saw fit to examine him to describe what he was talking about was there no objection from the defendant and the use of the word Kel is obviously not a meaningful reference to layjurors." The highly prejudicial and indelible effect of these several improprieties upon the jurors' fact-finding function was such that, notwithstanding the trial court's attempted curative instuctions which followed objections to the May 3 reference to an uncharged crime and to Sergeant McGowen's description of the premises on Washington Avenue as a "target of the investigation" as one of two "main distribution points for heroin" to which reference was made above, the defendant was effectively deprived of a fair trial. In *People v Alicea* (37 NY2d 601, 605), the criteria for a fair trial is expressed in the following language: "Criminal trials are to be so conducted that the proof will be legal evidence, unimpaired by intemperate conduct, impertinent counsel and irrelevant asides, all of which obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence. Although every trial may not be impeccably conducted and free of some error, we will not tolerate trials where unadulterated unfairness and deceit have become the rule. Evenhanded justice requires more and, as the ultimate guardian of the rights of the People and defendants in the State, we have a right to expect more." In *People v Crimmins* (36 NY2d 230, 238), the court held that "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right." Upon application of the foregoing rules, the defendant received less than what may be considered a fair trial. The judgment should be reversed and a new trial ordered.